*179 OPINION OF THE COURT
Joseph J. Maltese, J.
Medical specialists, who are presented with a radiologist’s written report of their patient’s radiograph (X ray), which contains a suggestion that the patient have a follow-up chest X ray within three months to reassess whether there is a pulmonary nodule on the patient’s lung are under a duty to advise the patient of such findings and suggestion for a follow-up X ray, even if the medical specialist is treating the patient for a different illness or condition.
The plaintiff alleges that the defendants are liable for medical malpractice and wrongful death because they failed to timely advise the decedent, Paul F. Mikus, in 2003 to obtain a follow-up X ray to assess and exclude the presence of a potential pulmonary nodule — a small mass on the lung, which may have been an indication of lung cancer. Plaintiff claims that Mikus became aware of his lung cancer in July of 2004, which resulted in his death three months later on October 30, 2004.
Defendants Dr. Frank Rosell, a surgeon, and Dr. Soad Bekheit-Saad, a cardiologist, have moved this court for an order to dismiss the actions against them pursuant to Civil Practice Law and Rules § 3211 (a) (5) because the plaintiffs claims are barred by the two-year-and-six-month statute of limitations found in CPLR 214-a.
The plaintiffs action against Dr. Frank Rosell is dismissed as being time-barred, because the last time he treated Mikus was on January 15, 2003 and this suit was filed more than two years and six months later on October 25, 2006. However, the motion to dismiss of Dr. Bekheit-Saad, who continued to treat Mikus through July 2004, is denied as premature. When and if Dr. Bekheit-Saad ever saw or read the radiology report of January 16, 2003 is a material fact as to whether she had knowledge of the contents of that report, or had a duty to obtain the report, and failed to advise the patient of its contents.
Facts
Dr. Marc Bogin, a cardiologist, referred Mikus to Dr. Bekheit-Saad, a board-certified cardiologist with a subspecialty in cardiac electrophysiology, because he had an abnormal heart stress test. Dr. Bekheit-Saad initially saw him only as a consultant for the purpose of evaluating his cardiac status and arrhythmia on January 6, 2003. She evaluated Mr. Mikus and her impression *180 was that he suffered from a coronary artery disease, specifically, inducible ventricular tachycardia. She scheduled an electrophysiology work-up which was completed on January 14, 2003. Mikus was admitted to Staten Island University Hospital (SIUH) with a diagnosis of paroxysmal ventricular tachycardia, which consists of recurrent attacks of rapid beating in the ventricle portion of the heart,[1] and a secondary diagnosis of ventricular fibrillation, a condition in which the heart’s electrical activity becomes disordered. On January 15, 2003, Dr. Frank Rosell, a cardiothoracic surgeon on staff at SIUH, implanted into Mikus’ chest an internal cardiac defibrillator, a battery powered electrical impulse generator, to detect cardiac arrhythmia and to correct it by delivering a jolt of electricity. Immediately after the surgery, Dr. Rosell ordered a bedside chest X ray to ascertain whether the defibrillator was placed properly into Mikus’ chest. Dr. Rosell read the X-ray film himself and was satisfied that he had placed the defibrillator properly. Since January 15, 2003, Dr. Rosell had no further contact with Mr. Mikus. Mikus was monitored by Dr. Bekheit-Saad, who evaluated him in the morning of January 16, 2003 and discharged him that same day with instructions for his aftercare and an appointment to meet with her in her private office on February 5, 2003.
During January 16, 2003, Dr. George Ciporkin, a former defendant radiologist, read Mikus’ chest X ray and dictated a report, which was transcribed on January 21, 2003, five days after Mr. Mikus was discharged from SIUH. No information has been presented whether Dr. Rosell or Dr. Bekheit-Saad ever received or read a copy of the radiology report, which was placed into Mikus’ hospital record after his discharge.
The radiology report confirmed that the defibrillator was in place, but it also contained the following statement in capital letters:
“IMPRESSION:
“PRESENCE OF A 1.9CM DENSITY PROJECTING AT THE LEVEL OF THE RIGHT FIRST ANTERIOR RIB, WHICH MAY REPRESENT THE PRESENCE OF COSTOCHONDRAL CALCIFICATION ASSOCIATED WITH THE RIGHT FIRST ANTERIOR RIB. HOWEVER, THE ACQUISITION OF A FOLLOW-UP FRONT RADIOGRAPH OF *181 THE CHEST IS SUGGESTED WITHIN THREE MONTHS FOR ASSESSMENT OF STABILITY AND EXCLUSION OF THE PRESENCE OF A POTENTIAL FOCAL PULMONARY NODULE, IF CLINICALLY INDICATED. PRESENCE OF DISCOID ATELECTASIS OR LINEAR PULMONARY FIBROSIS INVOLVING THE PERIPHERAL ASPECT OF THE LEFT LUNG BASE. NO ACUTE PATHOLOGIC PROCESSES ARE EVIDENT INVOLVING THE LUNGS BILATERALLY
It is undisputed that neither Dr. Rosell nor Dr. Bekheit-Saad advised Mr. Mikus of the findings of the radiology report nor did they ever order another chest X ray. The unanswered question is whether either Dr. Rosell or Dr. Bekheit-Saad were ever given a copy of the radiology report or whether either doctor ever saw and read the report. Both doctors merely state that Mr. Mikus was already discharged from the hospital before the radiology report was printed, which implies that they could not have told Mr. Mikus about the capitalized warning in the report to get a follow-up X ray.
Following the discharge, Dr. Bekheit-Saad saw Paul Mikus in her office on four occasions. The sole purpose of the visits was to evaluate the function of the internal cardiac defibrillator, cardiac status and arrhythmia. At the February 5, 2003, May 5, 2003, and September 8, 2003 visits, the defibrillator was tested and noted to be functioning well. On the July 21, 2004 visit, one episode of ventricular tachycardia was noted to have been successfully treated by the defibrillator, which prevented a sudden cardiac death. Hence, up to July of 2004 when the plaintiff’s claim that Mr. Mikus became aware that he had cancer, he was still attending follow-up visits with Dr. Bekheit-Saad on the functioning of the defibrillator. Mr. Mikus was instructed to return in four months for further evaluation, but unfortunately he died of lung cancer on October 30, 2004. Dr. Bekheit-Saad reiterates in her affidavit that she was only evaluating and treating Mikus with respect to his heart arrhythmias and the function of the internal cardiac defibrillator. She was not treating Mr. Mikus for his cancer because diagnosing and treating patients for cancer is not within her area of expertise as a cardiac electrophysiologist.
The plaintiff, in opposing the motions to dismiss, relies upon the affirmation of her attorney; a one-page, unauthenticated hospital record entitled “SI UNIVERSITY HOSPITAL PHYSI *182 CIAN ATTESTATION REPORT”; an unauthenticated hospital record entitled “pre-procedural interdisciplinary assessment” signed by Dr. Rosell; the unaffirmed chest X-ray report; and the affidavit of the plaintiff widow, Fern B. Mikus, dated October 16, 2007.
Discussion
The form of the opposition papers presented to this court may be insufficient to defeat a motion to dismiss.[2] However, disregarding the lack of certified or authenticated documents, and utilizing those documents, there still is insufficient evidence to hold Dr. Rosell, who last treated or saw Mr. Mikus on January 15, 2003, liable in malpractice or wrongful death in an action commenced on October 25, 2006 — more than two years and six months after he treated him.
CPLR 214-a states in part:
“An action for medical . . . malpractice must be commenced within two years and six months of the act, omission or failure complained of or last treatment where there is a continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure” (emphasis added).
The plaintiff argues that because Doctors Rosell and Bekheit-Saad ordered the bed-side chest X ray, they each had an independent duty to seek and obtain the full results of the study once it was reviewed by the radiologist. The plaintiffs counsel argues that the failure to notify the patient of the X-ray report was a departure from the standard of care, and states that expert testimony will be presented to support this point. However, no affirmation or affidavit from a medical doctor stating such was a departure from the standard of care was attached to the plaintiffs opposition or in the “sur-reply in opposition” when this theory was first presented to the court. In opposing a motion for summary judgment in a medical malpractice action, an expert must state what the standard of care was at the time the malpractice occurred.[3] General allegations of medical malpractice, merely conclusory in nature and unsupported by competent evidence stating the standard of care, are *183 insufficient to defeat defendants’ entitlement to summary judgment.[4]
It is undisputed that both Dr. Rosell and Dr. Bekheit-Saad treated Mr. Mikus for a heart condition and not cancer, which is a different illness or condition. The issue argued by the plaintiff is whether Dr. Rosell or Dr. Bekheit-Saad actually knew of the warning in the radiology report and failed to advise the patient or whether they had a duty to obtain and read the radiology report on the X-ray film that they utilized in the treatment of Mr. Mikus. This is contingent upon the discovery of such facts, which should have been presented herein.
This court holds that if either physician had a copy of that radiology report he or she would be under a duty to read it and advise the patient of such a warning and to refer him to his primary care physician for a follow-up X ray within three months of January 16, 2003, the date the written report was dictated. While no expert opinion has been presented to come to that conclusion, this court recognizes that such a duty is owed by a doctor to a patient, even where the doctor is treating the patient for a different illness, injury or condition. Whether any breach of the duty to disclose the X-ray results was a proximate cause or substantial factor in failing to timely diagnose Mr. Mikus’ lung cancer, which may have saved him from an untimely death, is another material issue not argued in this motion.
In a medical malpractice action, a plaintiff opposing a defendant doctor’s motion for summary judgment is required to proffer evidentiary facts sufficient to rebut the doctor’s showing that the claim is time-barred.[5] Allegations of a general and conclusory nature that are not supported by competent and admissible evidence and which do not demonstrate the essential elements of a medical malpractice action are not sufficient to defeat a motion for summary judgment.[6] The essential elements of a medical malpractice action comprise the following: (1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of plaintiff’s injury.[7] Most notably, with regard to the scope of a physician’s duty, the general duty of care owed by physicians to their patients may be limited to those medical functions undertaken *184 by the physician and relied upon by the patient.[8] Here, Dr. Resell implanted an internal cardiac defibrillator into the decedent to combat arrhythmia. The decedent relied upon him solely for that surgery. Dr. Bekheit-Saad undertook the aftercare on Mr. Mikus’ arrhythmia and the proper functioning of the defibrillator. While the aftercare continued until July 25, 2004, it was not related to the diagnosis and treatment of cancer.
Plaintiff relies on the continuous treatment doctrine, but that doctrine is clearly inapplicable to Dr. Rosell because there was no continuous treatment on his part. The “continuous treatment doctrine serves to toll the Statute of Limitations during a patient’s course of treatment with his or her physician.”[9] This doctrine is applicable so long as the treatment sought is “continuous . . . [and is] Tor the same illness, injury or condition which gave rise to the said act, omission or failure’ originally complained of.”[10] Medical office visits concerning matters unrelated to the condition at issue giving rise to the claim are insufficient to evoke the benefit of the doctrine.* [11] It is well settled that the “action accrues and the Statute of Limitations begins to run at the time of the commission of the alleged malpractice.”[12] If an action is commenced after two years and six months following the date of care or treatment at issue, it is time-barred.[13]
This action was commenced by the filing of a summons and complaint on October 25, 2006. Counting backwards, all claims of malpractice arising prior to April 25, 2004 would be time-barred as they would have been brought more than two years and six months from the filing of the complaint. However, if Dr. Bekheit-Saad actually knew of the findings of the radiology report and failed to advise Mr. Mikus or there was a duty to follow up and obtain it as his treating cardiologist, then arguably that duty to advise the patient of its contents may continue while she treated him after April 25, 2004. The fact that the X ray was taken for a heart condition and not as a diagnostic tool *185 in search of cancer may not relieve the cardiologist of her duty to inform the patient of the findings of the radiology report. Whether that warning to obtain a follow-up chest X ray would have been timely to interpose a cure or meaningful treatment of Mr. Mikus’ cancer after April 25, 2004 is at best speculative and at worst unlikely. But once again, that burden of proof is upon the plaintiff after further discovery and a deposition of Dr. Bekheit-Saad.
Accordingly, it is hereby ordered that the motion for summary judgment dismissing the causes of action against the defendant Dr. Frank Rosell is granted; and it is further ordered that the motion for summary judgment dismissing the causes of action against the defendant Dr. Soad Bekheit-Saad is denied.

. Physician’s Desk Reference Medical Dictionary 1782 (2d ed).

. Grasso v Angerami, 79 NY2d 813 (1991); Simms v APA Truck Leasing Corp., 14 AD3d 322 (1st Dept 2005).

. Rivera v Anilesh, 8 NY3d 627 (2007).

. Kramer v Rosenthal, 224 AD2d 392 (2d Dept 1996).

. Pierson v Good Samaritan Hosp., 208 AD2d 513 (2d Dept 1994).

. Winegrad v New York Univ. Med. Ctr., 64 NY2d 851 (1985).

. Holbrook v United Hosp. Med. Ctr., 248 AD2d 358 (2d Dept 1998).

. Boone v North Shore Univ. Hosp. at Forest Hills, 12 AD3d 338, 339 (2d Dept 2004), quoting Wasserman v Staten Is. Radiological Assoc., 2 AD3d 713, 714 (2d Dept 2003).

. Cósale v Hena, 270 AD2d 680, 682 (3d Dept 2000).

. Plummer v New York City Health & Hosps. Corp., 98 NY2d 263, 267 (2002), quoting CPLR 214-a; see also Cox v Kingsboro Med. Group, 88 NY2d 904 (1996).

. Id.

. Goldsmith v Howmedica, Inc., 67 NY2d 120, 122 (1986).

. De Peralta v Presbyterian Hosp., 121 AD2d 346 (1st Dept 1986).